**FOR PUBLICATION**



FILED
Nov 10 2014, 9:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAMES E. AYERS**
Wernle, Ristine & Ayers
Crawfordsville, Indiana

ATTORNEY FOR APPELLEES:

**CAROL A. DILLON**
Bleeke Dillon Crandall
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHRISTA ALLEN, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1311-PL-975 |
| | ) | |
| RICHARD HINCHMAN, M.D.; | ) | |
| RICHARD TANNER, M.D.; AND | ) | |
| JEFFERY SMITH, M.D., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Judge
Cause No. 49D12-1201-PL-3666

**November 10, 2014**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

In this case, we are asked to determine whether the standard of care for doctors treating incarcerated persons is a different, lower standard of care than that applied to their professional counterparts practicing outside prison walls. We find that it is not. The standard of care for doctors practicing in Indiana prisons is no different than the standard of care for doctors practicing within the general population.

Christa Allen appeals the trial court's grant of summary judgment in favor of appellees-defendants Doctors Richard Hinchman, Richard Tanner, and Jeffrey Smith (collectively, the Doctors) regarding her medical malpractice claim based on the treatment provided by the Doctors during her incarceration. Allen argues that the trial court erred when it determined that physicians who provide medical care to incarcerated persons are subject to a different, lower standard of care and found that her tendered expert, Dr. Wilson, was unqualified to testify because he was unfamiliar with the standard of care for physicians practicing in prisons. Allen asserts that Dr. Wilson was qualified to testify and maintains that there is a question of fact as to whether allowing her the use of a vaginal stent was medically necessary. Allen also argues that the trial court erred when it denied her motion to amend her complaint to allege a violation of the Eighth Amendment to the United States Constitution.

Finding that Dr. Wilson was qualified to testify, we conclude that summary judgment was inappropriate. However, we affirm the trial court's decision to deny Allen's request to amend her complaint, as her Eighth Amendment claim was barred by the relevant statute of limitations.

2

## FACTS

Allen received gender reassignment surgery on January 3, 17, and 22, 2002. Dr. Alan Neal Wilson performed a partial penectomy, bilateral orchiectomy, construction of a vaginal vault, construction of external genitalia, clitoroplasty, and a labioplasty. As part of Allen's treatment after leaving the hospital, Dr. Wilson prescribed hormone therapy and the use of a vaginal stent, which is a soft plastic appliance worn internally like a tampon.

Allen was incarcerated from March 2006 through December 2007. She was originally an inmate at the Marion County Jail. Representatives of the Marion County Superior Court Probation Department asked Dr. Wilson if it was necessary to continue to provide Allen with hormones and allow her the use of the stent, and Wilson advised them that the continued use of Allen's prescription and stent was necessary. Wilson testified that, to his knowledge, that recommendation was honored while Allen remained in the Marion County Jail.

On June 16, 2006, Allen entered the Department of Correction (DOC). Dr. Jeffrey Smith was her medical provider while she was housed at the Rockville Correctional Facility. During her intake examination, Allen disclosed that she had undergone gender reassignment surgery and that she took a female sex hormone, Estradiol. Allen also reported that she required the use of a vaginal stent to keep her vaginal vault dilated and to prevent atrophy.

On July 4, 2006, Allen submitted a request for healthcare, stating that she needed a stent for her vaginal vault to prevent closure. Dr. Smith contacted Dr. Wilson and asked whether the stent was a medical necessity or whether it was for cosmetic purposes. Dr. Wilson told him that the stent was necessary to maintain the integrity of Allen's vaginal vault. Dr. Smith and the prison administration determined that Allen's family could send her stent from home. Dr. Wilson faxed Allen's medical records and the prescription for the vaginal stent, and the prison property department was notified that Allen's stent was being sent from home and she should be allowed to keep it on her person. On August 17, 2006, Dr. Wilson's office informed Dr. Smith that Allen should wear the stent at all times and only remove it for cleaning purposes.

However, shortly after Allen was allowed the use of the stent, the prison Superintendent told Dr. Smith that Allen's use of the stent was a security breach. The stent was taken from Allen, and Dr. Smith determined that, as an alternative, Allen could use a hard vibrator to dilate her vagina. Beginning on August 18, 2006, Allen was permitted to use a vibrator twice a day to dilate her vagina.

At or around the middle of February 2007, Dr. Michael Mitcheff, the regional medical director for Correctional Medical Services, Inc., called Dr. Smith to inform him that he had met with the prison Superintendent and the DOC medical director, Dr. Elton Amos. The three determined that Allen did not need dilation treatment because it was "not medically necessary" and "only necessary to maintain the integrity of an elective procedure." Appellant's App. p. 3. While Dr. Amos did not think that Allen needed

4

vaginal dilation treatment, Dr. Mitcheff insisted that she be allowed to use something to dilate her vagina. The prison Superintendent and Dr. Amos then decided that Allen could use tampons for dilation.

On March 18, 2007, Allen submitted a request for healthcare, stating that she was finding blood on the tampons she was forced to use for dilation. The nurse who saw Allen in nursing sick call observed blood on Allen's tampon. On March 26, 2007, Allen again submitted a request for healthcare, this time stating that she needed her stent because she was beginning to have pain. The medical staff informed Allen that she no longer had an order for such care. On April 9, 2007, Allen submitted another request for healthcare, informing the medical staff that she was experiencing pain, bleeding, and muscle atrophy in her vaginal vault because she was not receiving dilation treatment.

Allen was transferred to the Indiana Women's Prison on May 16, 2007. There, she was no longer Dr. Smith's patient, and responsibility for her medical care was transferred to Dr. Richard Tanner. Dr. Tanner's affidavit states that he had very little to do with Allen's healthcare, as she "did not have any chronic health issues." Id. at 39. Dr. Tanner stated that he did not override the wishes of Dr. Amos regarding the stent because he did not feel there was a medical reason to do so. Allen was also cared for by Dr. Richard Hinchman, a gynecologist. Dr. Hinchman also "did not feel that a vaginal stent for Ms. Allen was medically necessary for her health." Id. at 42.

On May 16, 2007, Dr. Amos sent a letter to Allen, explaining his reasons for denying her dilation treatment. The letter stated in part:

5

The issues of bleeding and pain appear to have occurred because of tampon mis-use [sic] out of fear of vaginal and muscular atrophy, with the added anxiety that you would not be able to urinate. Your purpose of course, is to prevent closure and obviate the need for further surgery. The role of the medical provider in the incarcerated population is to provide basic and necessary healthcare. Maintenance of elective and or cosmetic procedures is not the assignment of our medical provider. The true outcome of not dilating or use of the stint [sic] as you request is possibly vaginal atrophy. This, however does not constitute a medical emergency and is a [sic] reversible upon your release.

Should medical complications occur from non-dilation, or any evidence arise that the essential bodily process of urination is impaired, serious attention will be given to your complaint.

Id. at 205.

On May 21 and June 4, 2007, Allen submitted a request for healthcare stating that she needed to see a gynecologist because she was still experiencing bleeding. However, Allen refused to use a sanitary napkin to allow the prison medical staff to observe the bleeding. Allen was told that there was no need to see the gynecologist regarding a dilator. On June 8, 2007, Allen was examined by a nurse practitioner, who did not find bleeding when she inserted a q-tip into Allen's vagina; the nurse practitioner did observe a light yellow discharge.

On June 19, 2007, Allen was examined by Dr. Hinchman, who would not refill Allen's Estradiol prescription until she received her overdue mammogram. That same day, Allen was transferred to the Indianapolis Women's Work Release Facility. Both Dr. Hinchman and Dr. Tanner remained responsible for Allen's medical care. Allen submitted a request for medical care on July 18, 2007, because she had only seven days

6

of her Estradiol prescription remaining. The Medical staff informed Allen that her prescription was on hold until she received a mammogram. Allen had a mammogram that same day, and her results were normal. Dr. Hinchman then renewed Allen's Estradiol on July 19, 2007. Allen was transferred back to the Indiana Women's Prison on September 21, 2007 because she refused to work.

Allen was released from incarceration on December 6, 2007. Upon her release, she was unable to use her stent, because her vaginal vault had contracted to the extent that it would not accept the stent. When Dr. Wilson examined Allen on September 24, 2008, he found that, as a result of her inability to use the stent, her vaginal vault had contracted and become unusable. Dr. Wilson estimated that it would cost between $60,000 and $120,000 to restore her vagina.

On March 24, 2009, Allen filed a proposed complaint against the Doctors. The case was reviewed by a medical malpractice review panel, and on October 27, 2011, the panel issued a unanimous opinion determining that the appellees did not breach their standard of care and that Allen's damages were not causally linked to the care appellees provided.

On January 26, 2012, Allen filed a complaint alleging medical malpractice in Marion Superior Court. On August 27, 2012, the Doctors filed a motion for summary judgment. Allen filed a response to the motion, supported by Dr. Wilson's affidavit. The Doctors then filed a reply in support of their motion for summary judgment, which was largely based on the deposition of Dr. Wilson. The Doctors alleged that Dr. Wilson had

7

recanted many of the statements in his affidavit because he admitted to a lack of knowledge concerning prison medical policies and procedures.

On April 30, 2013, Allen filed a motion for leave to amend her complaint, seeking permission to add a federal claim under 42 U.S.C. section 1983, arguing that the appellees had violated the Eighth Amendment proscription against cruel and unusual punishment. The Doctors filed their objections to Allen's motion for leave to file an amended complaint on May 6, 2013. On September 17, 2013, the trial court denied Allen's motion for leave to file an amended complaint, finding that the motion was untimely according to the statute of limitations deadline and Indiana Trial Rule 15.

On September 23, 2013, the trial court heard oral argument on the Doctors' motion for summary judgment, and, on October 23, 2013, the trial court granted summary judgment in favor of the Doctors. In its order granting summary judgment for the Doctors, the trial court determined that Allen had failed to provide expert testimony to rebut the opinion of the medical review panel, as is required in medical malpractice cases.

Dr. Wilson had stated that "he was familiar with the standard of care for family practitioners, gynecologists, and other physicians in Indiana who provide medical care for patients who have had male-to-female sex change operations, and that the defendants had failed to meet the required standard of care." Appellant's App. p. 292. However, the trial court also determined that Dr. Wilson was not an expert in "correctional medicine." Id. at 293. The trial court found that Dr. Wilson had admitted in his deposition that he

8

did not know whether the standard of care for Indiana prisons requires a physician to maintain Allen's hormone treatment and use of a stent.

During Dr. Wilson's deposition, he was asked by the Doctors' attorney:

Let's look at paragraph 24 of your affidavit. The first sentence, the standard of care for a physician charged with the care of a patient who had undergone the male-to-female sex change operation required maintenance of the hormonal supplements and the continued use of the stent. Do you know if this is true of doctors practicing within the prison setting in Indiana?

Id. at 245. To this Dr. Wilson replied, "No, I have no idea what their policy is." Id. The Doctors' and Allen's attorneys then argued about whether or not Dr. Wilson had answered the question regarding the standard of care or whether he was referring to prison policies. The following exchange then took place:

**Attorney for Appellees:** Your objection is on the record. Can you answer my question, please? Would you like me to restate it?

**Dr. Wilson:** You can restate it forever, but I still don't understand what you mean.

**Attorney for Appellees:** My question is, - and we can show the same objection so that we don't have to keep doing this, - my question is, you stated that the standard of care for a physician is to maintain hormones and to continue use of a stent. My question is, do you know if that is true for physicians working in Indiana prisons?

**Dr. Wilson:** I have no idea.

**Attorney for Appellees:** Thank you.

**Dr. Wilson:** There should be a policy on it somewhere.

9

Id. at 245-46.  This is the exchange the trial court cited to support its determination that Dr. Wilson had admitted he did not know what the standard of care in a prison required. Dr. Wilson later filed an affidavit stating that when he was asked whether the standard of care for physicians in Indiana prisons requires them to maintain hormones and to continue the use of a stent, he understood the question to be whether or not physicians in Indiana prisons comply with that standard of care.

In its order for summary judgment, the trial court found that Dr. Wilson's supplemental affidavit directly conflicted with his deposition testimony and struck the supplemental affidavit.  The trial court determined that Dr. Wilson's deposition testimony "clearly states that he cannot find that the Defendants practiced below the standard of care."  Id. at 292.  The trial court stated that "[b]ecause Dr. Wilson is unfamiliar with the standard of care for physicians practicing within a prison, he is not qualified to testify as to whether the Defendants breached that standard of care or to the issue of causation when they prohibited [Allen] from using the stent."  Id. at 294.

The trial court further found that "[i]n Indiana prisons, inmates do not receive medical treatment that is considered cosmetic or elective, nor do they receive medical treatment to maintain procedures that are cosmetic or elective; the role of the medical provider is to provide basic and necessary healthcare."  Id. at 293-94.  It determined that "operating within the Department of Corrections [sic] is different from the standard of care from physicians practicing within a prison."  Id. at 294.

Allen now appeals.

DISCUSSION AND DECISION

I. Standard of Review

When reviewing a grant of a motion for summary judgment, this court applies a well-settled standard of review. A trial court properly grants summary judgment when the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R. 56(C). The moving party bears the burden of specifically designating materials that make a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Interstate Cold Storage, Inc. v. GMC, 720 N.E.2d 727, 729 (Ind. Ct. App. 1999). Once the movant meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing a genuine issue for trial. Id. The nonmovant shows a genuine issue of fact "where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue." Id. at 730. Further, if the record reveals an incorrect application of the law to undisputed facts, summary judgment is inappropriate. Gen. Accident Ins. Co. of Am. v. Hughes, 706 N.E.2d 208, 210 (Ind. Ct. App. 1999).

A medical malpractice case is rarely appropriate for disposal by summary judgment. Chambers by Hamm v. Ludlow, 598 N.E.2d 1111, 1116 (Ind. Ct. App. 1992). To establish a prima facie case of medical malpractice, the plaintiff must demonstrate 1) a duty on the part of the defendant in relation to the plaintiff; 2) failure on the part of

11

defendant to conform his or her conduct to the requisite standard of care required by the relationship; and 3) an injury to the plaintiff resulting from that failure. Id. Generally, in order to establish a claim of medical malpractice, the plaintiff must establish the following by expert medical testimony: 1) the applicable standard of care required by Indiana law; 2) how the defendant doctor breached that standard of care; and 3) that the defendant doctor's negligence in doing so was the proximate cause of the injuries complained of. Id.

When the medical review panel[1] opines that the plaintiff has failed to satisfy any one of the elements of his prima facie case, the plaintiff must then come forward with expert medical testimony to refute the panel's opinion in order to survive summary judgment. Id.

## II. Standard of Care

Allen argues that the trial court erred in granting summary judgment in favor of the Doctors. She contends that physicians practicing in prisons are not subject to a different standard of care than those practicing in the general population. Therefore, Allen maintains that Dr. Wilson is knowledgeable about, and qualified to testify regarding, the standard of care of a physician treating a patient who has undergone gender reassignment surgery. As a result, Allen argues that we should find that she did

---

[1] In general, pursuant to Indiana Code section 34-18-8-4, an action against healthcare provider may not be commenced in an Indiana court unless the "claimant's proposed complaint has been presented to a medical review panel" and "an opinion is given by the panel."

12

provide expert testimony to rebut the panel and that summary judgment was inappropriate.

Conversely, the Doctors argue that we should find that the trial court correctly granted summary judgment in their favor. They contend that they were entitled to summary judgment because 1) the medical review panel found no breach of the standard of care, and 2) Dr. Wilson was not an expert in correctional care and did not know the standard of care applied to physicians working in a prison and therefore could not rebut the medical review panel.

At the outset, because it is dispositive, we will address the issue of the standard of care for physicians practicing in Indiana Prisons. In <u>Vergara by Vergara v. Doan</u>, 593 N.E.2d 185 (Ind. 1992), our Supreme Court did away with a locality rule. Under the standard of care articulated in <u>Vergara</u>, "a physician must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which he belongs, acting under the same or similar circumstances." <u>Id.</u> at 187. Under this standard, locality is only one factor to be considered, along with advances in the profession, availability of activities, and whether the doctor is a specialist or general practitioner. <u>Id.</u>

We find that the standard of care for doctors practicing in prisons is the same as the standard of care for physicians practicing outside of prison. While we are cognizant that, sometimes, physicians in prisons will face difficulties that physicians practicing outside of prisons will not encounter, we believe that these difficulties can be taken into

13

account under the standard articulated in <u>Vergara</u>. 593 N.E.2d at 187. As noted above, under this standard, several factors are considered, including locality, advances in the profession, availability of activities, and whether the doctor is a specialist or general practitioner. <u>Id.</u> While it is possible that, when determining whether a physician has breached the standard of care, security and budget concerns facing prison physicians can be taken into account, these considerations would be determinations to be made by the finder of fact. The question raised here is not whether an elective procedure should be performed but rather whether a procedure made necessary as a result of an already performed surgery, elective or not, should be performed. There is a significant difference.

At oral argument, counsel for the Doctors conceded that the standard of care for doctors practicing inside a prison is the same standard of care applied to physicians practicing in the general population—except in certain circumstances. Counsel has never articulated, in the briefs or oral argument, what these circumstances might be. Rather, as we glean from oral argument, these unique circumstances seem to arise from budgetary and security concerns within the DOC. However, while the Doctors continually allude to the vague idea of security concerns, no such cognizable concerns have been articulated.

First, no security concern was ever presented regarding the use of the stent. There is nothing present in the record or in the briefs—and nothing was articulated at oral argument—to explain how the stent, a soft, plastic device used to maintain the integrity of the vaginal vault, might have caused security concerns. While there are vague suggestions in the brief that other inmates might have requested a stent or somehow

14

misused Allen's, such nebulous concerns are not elaborated upon. Moreover, the Doctors do not claim that other concerns, such as budget or unique prison circumstances, created special circumstances under which prison doctors are held to a different standard of care.

The only specific security concern articulated to this Court related to the treatment Dr. Smith authorized after it was determined that Allen could no longer use the stent. That treatment involved the use of a hard dildo for ten minutes twice a day in the infirmary. Appellant's App. p. 74-75. That treatment was stopped because "Dr. Hinchman felt that providing a dildo or vibrator, which could be turned into a weapon, would violate the security policies of the prison." Appellee's Br. p. 12. At oral argument, counsel abandoned any concern about a weapon. Instead, counsel raised a new concern—that the use of a vibrator or dildo posed a security concern because it might make the other inmates jealous. How the other inmates would become jealous if Allen was allowed to continue this treatment in the privacy of the infirmary, and how that, in turn, causes a security concern, we cannot say, and counsel could not explain.

However, even if we were to determine that the dildo or vibrator might have created a security risk, that does not explain how the <u>stent</u> constituted a security concern. The Doctors denied Allen the use of the stent, knowing that the denial was likely to result in vaginal atrophy, and yet there are no articulated reasons as to why the stent might have posed security or budgetary concerns. We also note that the Doctors treated Allen with the full knowledge of the regimen recommended by Dr. Wilson, who informed them that

15

Allen's hormone therapy and continued use of the stent were medically necessary.[2] Appellant's App. p. 33. Indeed, Allen was originally allowed to use her stent. Id. As the Doctors have argued, "the Department of Correction does not provide inmates with medical treatment that is . . . not necessary for their health." Appellants' Br. p. 12. It follows that, since they allowed Allen to use the stent when she entered the DOC, at some point the Doctors did indeed consider the stent to be a medical necessity.[3] Yet somehow, once Dr. Amos decided Allen should no longer use the stent, the stent was no longer "medically necessary." Appellant's App. p. 205.

Again, we recognize that medical care in the DOC involves additional considerations not present in a hospital or general care facility. However, we cannot find that physicians practicing in prisons may deviate from the standard of care without reasonable, articulable concerns. In short, we do not find that physicians practicing in prisons may determine the standard of care based on the circumstances and concerns facing them with regard to individual patients, especially when such concerns remain

---

[2] The Doctors also assert that Allen received her hormones daily as prescribed. Allen's medical records show that Estradiol was ordered; however, it is unclear whether or not Allen actually received her hormones daily as prescribed. Allen claims that the medical records show that she only received the hormone prescription sporadically and not as prescribed. The medical administration records are unclear, to the point of being indecipherable. They can be found on pages 198 to 204 of the appellant's appendix. The record does show that Dr. Wilson received information relaying that Allen was complaining that she was not receiving her Estradiol as prescribed.

[3] The trial court found that inmates in Indiana prisons do not receive treatment that is considered cosmetic or elective, nor do they receive treatment to maintain cosmetic or elective procedures. Appellant's App. p. 293-294. Considerations specific to the prison environment such as locality and availability may factor into determining the appropriate standard of care with respect to the initial provision of cosmetic or elective procedures to inmates while imprisoned. However, the maintenance of cosmetic or elective procedures which an inmate may have received before entering the prison would seem to be a different matter altogether given, as we have stated, that the standard of care is the same regardless of whether a physician is practicing in and outside of a prison setting.

vague and nebulous. To do so would be to empower prison physicians to determine for themselves what standard of care should apply based on each individual case, a practice we will not endorse.

Therefore, as we find that standard of care for doctors practicing in prisons is the same as the standard of care for physicians practicing outside of prison, we conclude that Dr. Wilson was qualified to testify as an expert. The medical review board found that the Doctors did not breach their standard of care and that Allen's damages were not causally linked to the care appellees provided. Dr. Wilson's expert opinion rebutted the medical review board. Therefore, summary judgment was inappropriate in this case.

### III. Allen's Request to Amend Her Complaint

Allen also argues that the trial court erred when it denied her motion to amend her complaint to include a claim under 42 U.S.C. section 1983 and found that it was barred by the statute of limitations. She contends that the Indiana Medical Malpractice Act provides the applicable statute of limitations and tolling provisions and asserts that her action was tolled by the medical review process.

The United States Supreme Court has recognized that the Civil Rights Acts do not provide a limitations period governing respondents' claims under 42 U.S.C section 1983. Burnett v. Grattan, 468 U.S. 42, 49 (1984). In Burnett, it stated that "it was settled" that federal courts would turn to state law to determine the statute of limitations brought under 42 U.S.C section 1983. Id.

However, since that time, the United States Supreme Court has held that, while state law may govern the length of the limitations period and related questions of tolling and application, the characterization of civil rights statutes for limitations purposes is a federal question. Wilson v. Garcia, 471 U.S. 261, 268 (1985). Concern that "if the choice of the statute of limitations were to depend upon the particular fact or the precise legal theory of each claim, counsel would almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim," led the United States Supreme Court to determine that a simple, broad characterization of all section 1983 civil rights claims best fit the statute's remedial purpose. Id. at 274. Therefore, it held that section 1983 claims are best characterized as personal injury actions. Id. at 280.

Therefore, the statute of limitations for a section 1983 action is governed by the personal injury statute of the state where the alleged injury occurred. Parks v. Madison County, 783 N.E.2d 711 (Ind. Ct. App. 2002) (citing Wilson, 471 U.S. at 261)). In Indiana, that period of limitations is two years. See Ind. Code § 34-11-2-4. Allen's claim under section 1983 for alleged deliberate indifference to a serious medical need would be a continuing violation, and, therefore, her cause of action accrued, for the purposes of the statute of limitations, on the last day of the denial of medical care or on the date that she was released. See Heard v. Shannon, 253 F.3d 316, 317-20 (7th Cir. 2001) (holding that an inmate's 42 U.S.C. section 1983 claim for a continuing denial of medical care accrued for limitations purposes on the last date officials refused to treat his condition or on the

date the inmate left jail). As Allen was released from the DOC on November 24, 2007, she would have needed to file her complaint by November 24, 2009. Appellant's App. p. 155. She failed to do so. Therefore, we find that the trial court did not err when it denied Allen's request to amend her complaint to include a section 1983 claim, as such a claim was barred by the statute of limitations.

The judgment of the trial court is reversed in part and affirmed in part.

KIRSCH, J., and ROBB, J., concur.