

**FILED**

Feb 09 2015, 10:01 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Douglas E. Sakaguchi
Jerome W. McKeever
Pfeifer Morgan & Stesiak
South Bend, Indiana

ATTORNEY FOR APPELLEE
SAINT JOSEPH REGIONAL
MEDICAL CENTER

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE
MICHAEL BORKOWSKI, M.D.

Louis W. Voelker
Megan C. Brennan
Eichhorn & Eichhorn, LLP
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jamie Thomson,

*Appellant-Plaintiff,*

v.

Saint Joseph Regional
Medical Center and
Michael Borkowski, M.D.,

*Appellees-Defendants*

February 9, 2015

Court of Appeals Cause No.
71A04-1405-CT-246

Appeal from the St. Joseph Circuit
Court.
The Honorable Michael G. Gotsch,
Judge.
Cause No. 71C01-1211-CT-215

**Baker, Judge.**

[1] Jamie Thomson appeals the entry of summary judgment in favor of defendants St. Joseph Regional Medical Center and Michael Borkowski. Thomson claims to have suffered an injury to the nerves in her shoulder and arm when a board supporting her arm became detached during surgery, leaving her arm dangling towards the floor for an unknown period of time. A medical review panel determined that neither defendant failed to meet the applicable standard of care and that neither defendants' actions were the proximate cause of Thomson's injury. We find that, given the nature of this case, Thomson was not required to present expert testimony to rebut the panel's conclusion as to either defendant's failure to meet the standard of care. We also find that the expert testimony Thomson presented was sufficient to rebut the panel's conclusion as to causation. Accordingly, we reverse and remand for further proceedings.

## Facts

[2] On July 20, 2009, Thomson underwent a hysterectomy at St. Joseph Regional Medical Center (SJRMC) for which Michael Borkowski provided anesthesia. Thomson was lying on an operating table with her arms out from her side and her palms facing upwards. Her arms were supported by padded arm boards that had been attached to the table. Her arms were secured to these arm boards by a strap.

[3] The procedure lasted for approximately two hours, from 7:32 a.m. to 9:24 a.m. At approximately 8:30 a.m., Dr. Borkowski noticed that Thomson's right arm was dangling towards the floor because the right arm board had become

detached. Dr. Borkowski did not know how or when the arm board had become detached. He reattached the arm board and noted the incident in his record.

[4] When she awoke from surgery, Thomson complained of pain in her right arm. Dr. Borkowski explained that her arm board had become detached during surgery and that this could have resulted in nerve damage to her arm. Thomson met with Dr. Zimmerman, a neurologist at SJRMC, who diagnosed her with a right radial nerve injury that had probably been caused by compression.

[5] Thomson had two follow-ups with Dr. Zimmerman, after which Dr. Zimmerman reported that Thomson was experiencing residual symptoms. About a month after these follow-ups, on September 17, 2009, Dr. Zimmerman ordered an electromyogram of Thomson's arm. The test came back indicating normal nerve structure and function. Thomson visited Dr. Zimmerman again on March 1, 2010, and reported loss of pin-prick sensation and temperature sensation in her right thumb. On August 31, 2010, Thomson had her final visit with Dr. Zimmerman, after which he told her that he had done everything he could.

[6] On April 15, 2011, Thomson filed a proposed complaint against SJRMC and Dr. Borkowski with the Indiana Department of Insurance. On May 14, 2012, the case went before a medical review panel consisting of three physicians. On July 9, 2012, all three members of the panel determined that neither defendant

failed to meet the appropriate standard of care and that their conduct was not a significant factor in any permanent injury Thomson may have suffered.

[7] On November 27, 2012, Thomson filed a complaint in the trial court alleging that SJRMC and Dr. Borkowski failed to meet the appropriate standard of care, resulting in injuries to Thomson. SJRMC and Dr. Borkowski both filed motions for summary judgment, citing the opinion of the panel.

[8] In response, Thomson designated as evidence the deposition testimony of Dr. Zimmerman, an affidavit of registered nurse Abigail Stanley, and the deposition testimony of anesthesiologist Robert Gill, who had been a member of the panel that originally found against Thomson.

[9] Dr. Zimmerman testified that he believed Thomson had suffered a radial nerve injury as a result of the arm board becoming detached. Stanley stated in her affidavit that employees of SJRMC failed to meet the standard of care. Dr. Gill gave equivocal testimony as to whether Dr. Borkowski had failed to meet the appropriate standard of care. When questioned by Thomson, Dr. Gill indicated that Dr. Borkowski had failed to meet the standard of care, but when questioned by Dr. Borkowski, Dr. Gill indicated that Dr. Borkowski had met the standard of care.

[10] A hearing was held on February 11, 2014. With respect to Dr. Gill's deposition testimony, the trial court concluded that Dr. Gill's equivocations showed that he had not changed his original opinion and, therefore, his testimony was insufficient to rebut the panel's conclusion as to Dr. Borkowski's failure to meet

the standard of care. The trial court further found that Dr. Zimmerman's testimony was insufficient to rebut the panel's conclusion that there was no causal relationship between either defendants' conduct and Thomson's injury. The trial court then granted summary judgment in favor of SJRMC and Dr. Borkowski. Thomson now appeals.

## Discussion and Decision

[11] With respect to the applicable standard of care and the defendants' alleged failure to meet it, Thomson makes two arguments: (1) Dr. Gill's equivocal testimony as to whether Dr. Borkowski failed to meet the standard of care created a question of fact; and (2) because detachment of the arm board clearly shows a failure to meet the standard of care, Dr. Gill's expert opinion as to the standard of care was not even needed. With respect to causation, Thomson argues that Dr. Zimmerman's testimony that Thomson's injury was caused by the collapse of the arm board created a question of fact as to a causal relationship between the defendants' conduct and the injury. Therefore, Thomson argues that genuine issues of material fact precluded the trial court from granting summary judgment in favor of SJRMC and Dr. Borkowski.

## I. Standard of Review

[12] Summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). It is initially the moving party's burden to make a prima facie showing that this is the case.

*McIntosh v. Cummins*, 759 N.E.2d 1180, 1183 (Ind. Ct. App. 2001).  Once the moving party meets this burden, the burden shifts to the non-moving party to present evidence showing the existence of a genuine issue of material fact.  *Id.* "A medical malpractice case based upon negligence is rarely an appropriate case for disposal by summary judgment, particularly when the critical question for resolution is whether the defendant exercised the requisite degree of care under the circumstances."  *Id.*  In other words, this issue is generally a question for the trier of fact.  *Id.*

To establish a prima facie case of medical malpractice, a plaintiff must demonstrate: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure. *Bunch v. Tiwari*, 711 N.E.2d 844, 850 (Ind. Ct. App. 1999).

Before commencing a medical malpractice action, a plaintiff must present a proposed complaint to a medical review panel.  Ind. Code § 34-18-8-4.  If the panel renders an opinion against the plaintiff, to survive summary judgment, the plaintiff must present expert medical testimony to rebut the panel's opinion. *Bunch*, 711 N.E.2d at 850.

## II.  Standard of Care

Health care providers must "possess and exercise that degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful, and prudent practitioner in the same class to which [they] belong[] treating such maladies

under the same or similar circumstances." *Vogler v. Dominguez*, 624 N.E.2d 56, 59 (Ind. Ct. App. 1993). The medical review panel initially determines whether the defendant has met this standard.

[16] In this case, after reviewing Thomson's claim, the panel found that "[t]he evidence submitted does *not* support the conclusion that defendants . . . failed to meet the appropriate standard of care . . . ." Appellant's App. p. 50 (emphasis original). Thomson attempted to counter this finding with the affidavit of registered nurse Abigail Stanley and the deposition testimony of anesthesiologist Robert Gill.

[17] Stanley stated in her affidavit that, in her opinion, "the standard of care was breached in this case." Appellant's App. p. 81. Stanley concluded that "the operating room nurse, the anesthesiologist, and the surgeon all should have worked together to maintain proper positioning at the beginning of the case making sure the arm board was attached correctly and throughout the entire procedure." *Id.* The trial court struck the portions of Stanley's affidavit in which she gave her opinion as to the standard of care for anesthesiologists and surgeons. Tr. p. 4. SJRMC has conceded that "Stanley's affidavit created a genuine issue of material fact regarding SJRMC's compliance with the appropriate standard of care." Appellee's Br. p. 2.

[18] With respect to Dr. Borkowski's alleged failure to meet the standard of care, Thomson designated Dr. Gill's deposition testimony. During a deposition, Dr.

Gill gave equivocal testimony as to whether he believed Dr. Borkowski failed to meet the standard of care.

[19] Thomson argues that we need not consider the relevance, or lack thereof, of Dr. Gill's equivocations because "the fact that the arm board became detached during [her] surgery—for a long enough time for her to suffer a nerve injury—is enough to allow an inference that Dr. Borkowski breached the standard of care." Appellant's Br. p. 23. Therefore, Thomson argues that Dr. Gill's testimony was not needed to rebut the panel's conclusion.

[20] We agree with Thomson's conclusion that expert testimony was not required in this case. This Court has previously dispensed with the need for expert opinion when a case fits within the "common knowledge" or res ipsa loquitur exception. *Malooley v. McIntyre*, 597 N.E.2d 314, 318-19 (Ind. Ct. App. 1992). "The doctrine of res ipsa loquitur is a rule of evidence which allows an inference of negligence to be drawn from certain surrounding facts." *Gold v. Ishak*, 720 N.E.2d 1175, 1180 (Ind. Ct. App. 1999). The plaintiff's evidence must include the underlying elements of res ipsa loquitur, showing that: (1) the injuring instrumentality is under the management or exclusive control of the defendant or his servants and (2) the accident is such as in the ordinary course of things does not happen if those who have management of the injuring instrumentality use proper care. *Id.* at 1181.

[21] Thomson must first show that Dr. Borkowski had "exclusive control" of the arm board. In determining whether a defendant had exclusive control of an

instrumentality, we do not focus on who had actual physical control, but, rather, who had the right or power of control and the right to exercise it. *Vogler*, 624 N.E.2d at 61. Dr. Borkowski argues that he "did not, at any time, have exclusive control over the arm board" because "non-exclusive control was shared by several people." Appellee's Br. p. 20, 22.

[22] However, "[e]xclusive control may be shared control if multiple defendants each have a nondelegable duty to use due care." *Vogler*, 624 N.E.2d at 62. Thus, Thomson does not need to show that Dr. Borkowski had sole control over the arm board. Furthermore, "[e]xclusive control is satisfied if the defendant had control at the time of the alleged negligence." *Id.* Here, it was Dr. Borkowski himself who reattached the arm board after he noticed Thomson's dangling arm. Appellant's App. p. 151. Through this act, Dr. Borkowski demonstrated that he had the power to correctly place and maintain the position of the arm board at the time of the alleged negligence. Therefore, he had exclusive control of the arm board for the purposes of res ipsa loquitur.

[23] Dr. Borkowski next argues that, because the surgeon was not named as a defendant in this case, Thomson has failed to show exclusive control because any negligence could be imputed solely to the surgeon. Dr. Borkowski cites this Court's opinion in *Vogler*, in which Vogler suffered an injury as a result of his body being moved while his head was secured in a head frame. 624 N.E.2d 56. This Court held that when an anesthesiologist was not named as a defendant and there was a reasonable probability that any negligence may have been

solely attributable to the anesthesiologist, a jury could not infer that it was more probable than not that the defendant hospital had been negligent. *Id.* at 63.

[24] Thomson's case is distinguishable in that her injury was not the result of one act—such as moving a person's body—for which one defendant could be solely responsible. Rather, it was potentially the result of multiple acts of negligence by multiple people in failing to notice Thomson's arm hanging out of position for a period of time long enough to cause injury. Thus, even assuming the surgeon set the arm board in place, that fact would not absolve the hospital staff or the anesthesiologist—the named defendants in this case—who may have a duty to monitor the positioning of Thomson's arm throughout the surgery.[1]

[25] Thomson must next show that the accident is such as in the ordinary course of things does not happen if those who have management of the injuring instrumentality use proper care. *Gold*, 720 N.E.2d at 1180. To make this showing, Thomson can rely upon common sense and experience. *Vogler*, 624 N.E.2d at 61.

[26] Dr. Borkowski argues that Thomson cannot rely upon common sense and experience in this case because "[a] lay person does not know the mechanics of [arm] positioning during an operation" or "how an arm board is attached to a surgical bed." Appellee's Br. p. 24. This may be, however, a lay person does

---

[1] In several sections throughout his brief, Dr. Borkowski emphasizes that we do not know who attached the arm board. Appellee's Br. p. 14, 21. However, if Dr. Borkowski had a duty to monitor the positioning of Thomson's arm, he could have breached that duty regardless of who originally attached the arm board.

not need to know the precise contours of arm positioning during surgery to understand that an arm should not be left dangling towards the floor. As for how the board became detached, Dr. Borkowski does not argue that this incident was something that could ordinarily be expected to happen in the course of surgery. Therefore, it suffices to say that common sense and experience lead us to conclude that an arm board should not become detached leaving a patient's arm dangling for such a period of time that the patient suffers nerve injury.

[27] We reiterate that res ipsa loquitur only allows for an inference of negligence. *Cleary v. Manning*, 884 N.E.2d 335, 340 (Ind. Ct. App. 2008). We have not found conclusively that Dr. Borkowski or SJRMC were negligent nor have we found conclusively that either failed to meet the standard of care. Both defendants are free to present evidence and argue all issues before the trier of fact. *Id.* Our finding that the res ipsa loquitur exception applies in this case means only that expert testimony was not needed to rebut the panel's conclusion and summary judgment was inappropriate.[2]

# III. Causation

[28] After reviewing Thomson's claim, the medical review panel found that "[t]he conduct complained of against defendants . . . was *not* a significant factor in any

---

[2] Because we find that the exception applies here, we do not need to address whether Dr. Gill's equivocal testimony was sufficient to create a question of material fact.

permanent injury." Appellant's App. p. 50 (emphasis original). Thomson attempted to counter this finding by designating the testimony of Dr. Zimmerman, the neurologist who treated Thomson after her injury. During Dr. Zimmerman's deposition, the following exchange took place:

> Q: Doctor, based on your treatment of Jamie, her complaints, the history that was presented to you, and based on your experience, can you say within a reasonable degree of medical certainty that she sustained an injury to her radial nerve during her hysterectomy when the arm board collapsed?
>
> A: Yes.

*Id.* at 108.

[29] On appeal, SJRMC argues that this testimony does not create an issue of material fact because the statement "does not even address the concept of causation, [and] at best, establishes a temporal relationship." Appellee's Br. p. 28.

[30] In support of this argument, SJRMC cites *Gresser v. Dow Chemical Co.,* 989 N.E.2d 339 (Ind. Ct. App. 2013), *trans. denied.* In *Gresser*, the Gressers moved into a home that had been chemically treated for termites thirteen months earlier. The Gressers became ill and filed a lawsuit. The defendants sought to exclude expert testimony that the chemical treatment had caused the illness. This Court noted that "[a]n expert's opinion is insufficient to establish causation when it is based *only* upon a temporal relationship between an event and a subsequent medical condition." *Id.* at 347 (quotations omitted) (emphasis original).

[31] Here, assuming solely for the sake of argument that the analysis in *Gresser* applies outside of the products liability context,[3] we find that Dr. Zimmerman's opinion is based on more than the temporal relationship between the collapse of the arm board and Thomson's injury. Dr. Zimmerman performed an initial examination of Thomson following the incident and noted Thomson had sustained injury "probably from compression." Appellant's App. p. 107. When questioned further, Dr. Zimmerman clarified:

> A:    Well, based on the description that is in the note here that when the arm board collapsed, her arm would've been hanging on the OR bed with pressure in this area, in the radial . . . in the triceps, nerve radial spiral groove area.
>
> Q:    And the spiral groove is what?
>
> A:    It's the groove where the nerve travels right near the bone.
>
> Q:    The . . . that type of mechanism of injury, would that be consistent with the complaints that she presented with, as well as your physical examination findings?
>
> A:    Yes.

*Id.*

---

[3] In *Gresser*, this Court prefaced the above quoted statement by noting:

> In particular, we have held that when an expert witness testifies *in a chemical exposure case* that the exposure has caused a particular condition because the plaintiff was exposed and later experienced symptoms, without having analyzed the level,
>
> concentration *or* duration of the exposure to the chemicals in question, and without sufficiently accounting for the possibility of alternative causes, the expert's opinion is insufficient to establish causation.

989 N.E.2d at 347 (quotations omitted) (emphasis added).

Thus, Dr. Zimmerman based his conclusion on what he believes was likely to have happened to Thomson's nerves when her arm was hanging in that position, not merely on a temporal relationship between the collapse of the arm board and her injuries. This expert opinion was sufficient to rebut the opinion of the medical review panel and, consequently, create a question of fact. Summary judgment was therefore inappropriate.

The judgment of the trial court is reversed and the cause is remanded for further proceedings.

Vaidik, C.J., and Riley, J., concur.