ATTORNEYS FOR APPELLANTS

John Morris
Stan Brown
Morris Law Firm
Lafayette, Indiana

ATTORNEYS FOR APPELLEE
HENDRICKS REGIONAL
HEALTH

Ronald A. Mingus
Nicholas G. Brunette
Katherine M. Haire
Reminger Co., LPA
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
IAN JOHNSTON, M.D.

James W. Brauer
Katz Korin Cunningham PC
Indianapolis, Indiana



FILED

Feb 21 2019, 5:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE
# COURT OF APPEALS OF INDIANA

Marigold Overshiner and Earl Overshiner, Individually and as Parents and Guardians of their Minor Daughter, Kaitlyn Overshiner, and Kaitlyn Overshiner,

*Appellants-Plaintiffs*,

v.

Hendricks Regional Health and Ian Johnston, M.D.,

*Appellees-Defendants*.

February 21, 2019

Court of Appeals Case No. 18A-CT-582

Appeal from the Putnam Circuit Court

The Honorable Matthew L. Headley, Judge

Trial Court Cause No. 67C01-0610-CT-321

**Brown, Judge.**

[1] Marigold Overshiner and Earl Overshiner, Individually and as Parents and Guardians of their Minor Daughter, Kaitlyn Overshiner, and Kaitlyn Overshiner (collectively, the "Overshiners") appeal the trial court's directed verdict in favor of Hendricks Regional Health ("Hendricks Regional") and Ian Johnston, M.D. ("Dr. Johnston" and together with Hendricks Regional, "Providers"). We affirm.[1]

### Facts and Procedural History

[2] On September 27, 2006, the Overshiners filed a complaint for damages against Providers and other defendants in the Putnam Circuit Court, after having filed a proposed complaint with the Indiana Department of Insurance pursuant to the Indiana Medical Malpractice Act. The medical review panel, consisting of a board-certified pediatrician, a board-certified obstetrician-gynecologist, and a neonatologist, unanimously decided that Providers and other defendants did not breach the standard of care or cause the claimed injuries. The complaint alleged that Marigold presented in active labor on October 26, 2004, at Hendricks Regional Hospital in Danville, Indiana, that "Marigold was admitted to the hospital under the care, treatment and supervision of [Dr. Johnston]," and that Dr. Johnston "was Marigold's obstetrician during this pregnancy, beginning on or about March 11, 2004" and "[k]new that Marigold was blood type O negative and anti-D positive" early on in her pregnancy and prior to October 26, 2004.

---

[1] We heard oral argument in this case on January 23, 2019, in Indianapolis, and thank counsel for their oral advocacy and written presentations in this matter.

Appellee Hendricks Regional's Appendix Volume II at 5. It stated that, within the first twenty-four hours following her birth the night of October 26, 2004, Kaitlyn's cord blood indicated that she was RH positive, which was indicative of hemolytic disease of the newborn; that on the morning of October 27, 2004,[2] Kaitlyn's newborn Total Serum Bilirubin ("TSB") was 9.2; and that she developed jaundice and was treated with phototherapy on the same day. The complaint further alleged that Kaitlyn's risk factors for severe neonatal hyperbilirubinemia were present prior to, during, and after her birth, and that she suffered hyperbilirubinemia and other medical conditions and physical injuries, including, but not limited to, blindness.

[3] On November 27, 2017, an eight-day jury trial commenced. On November 30, 2017, the Overshiners began four days of testimony by Dr. Robert Shuman, a retired neuropathologist who currently provides "mostly medical-legal consultations."[3] Transcript Volume II at 39. He testified that he decided to be a pediatric neuropathologist and "wanted to be a person who looked at the brains of children we lost and reason, or figure out, or explore, or determine why we lost those children" in medical school. *Id.* at 10. He indicated that, when he started his pediatric neuropathology training, he "changed from the bedside to

---

[2] The complaint states that Kaitlyn was born on October 26, 2004, but then alleges events involving her "newborn" Total Serum Bilirubin to have occurred in October 2006. Appellee Hendricks Regional's Appendix Volume II at 5. This appears to be a scrivener's error.

[3] When prompted, Dr. Shuman testified that all of the charges in this case to date for his services as an expert witness for the Overshiners amounted to $120,900.

the autopsy room" and from 1971 to 1975 autopsied "4,300 brains, of which 1,500 were infants and children." *Id.* at 13-14. He testified he did not engage in direct patient practice from the period of 1970 through 1975 "when we still had Rh disease." *Id.* at 15.

[4] Dr. Shuman stated that he has a board certification in neuropathology and that he was "board-certified in neurology with special competence in neurology." *Id.* at 30. He later indicated he was not, nor eligible to be, a member of the American Academy of Pediatrics and that he was "not an active member but . . . retired" from the American Academy of Neurology. Supplemental Transcript Volume II at 103. He testified that he had been licensed to practice medicine "[s]ince 1990, or 1991" and, from 1991 until 2014, was in South Bend, Indiana, where he "practiced child neurology, founding a . . . clinical practice of child neurology . . . which [he] then maintained until [his] retirement in 2006,"[4] and he later testified that upon retiring he moved to California. Transcript Volume II at 4, 26.

[5] At a later point during cross-examination, Dr. Shuman answered affirmatively when he was asked "we've already gone over that you're not a pediatrician and not an obstetrician, correct[?]" Supplemental Transcript Volume II at 130. He

---

[4] Dr. Shuman later stated that, at his clinic, he developed a close relationship with his pediatricians, who he "trained for a number of emergency situations, and . . . when to call" him. Transcript Volume II at 38. He explained further that he "could even go out of town for a week every six months, and if they were in trouble, they called me, and the mothers would call me, and I'd be able to take care of the issue over the telephone, or tell them where to go, when to go, where to go, very important." *Id.*

answered affirmatively when he was asked whether the guidelines of the American Academy of Neurology provided "[i]f a medical expert is not in active clinical practice when offering an expert opinion," the expert "should be prepared to demonstrate competence to provide such an opinion," and that evidence of competence may include "active clinical practice," "relevant publications in medical or scientific journals," and "active teaching or supervision of medical students, residents, or fellows in an area relevant to the expertise opinion . . . ." *Id.* at 104. Dr. Shuman agreed that he did not meet the American Academy of Neurology's guidelines for testifying because he was not in active clinical practice, did not teach, and had no publications "since you returned." *Id.* at 104-105. He also indicated that he had never been involved in the handover between the obstetrician and the pediatrician after a child is born, "[e]xcept in [his] training as a pediatrician," which he subsequently admitted he did not complete. *Id.* at 130.

[6] When counsel for the Overshiners moved to submit Dr. Shuman "as qualified to be an expert," the following exchange occurred:

> THE COURT: Any statement from the defense? I thought we –
>
> [Counsel for Hendricks Regional]: Your Honor, I'm sorry. Don't we have a motion in limine already –
>
> THE COURT: Right.
>
> [Counsel for Hendricks Regional]: – that the Court has already addressed.
>
> THE COURT: Right. Ladies and gentlemen, we'll show that the doctor – it [sic] obviously is a doctor. You'll hear from a lot of

doctors here the next few days, okay? And we've already heard what his areas of his practice were in.

Transcript Volume II at 40.

[7] Dr. Shuman indicated that he "really [thought] that there's a tremendous amount of variability" to dealing with Rh disease with respect to the standards of practice. *Id.* at 114. In comparing himself to a typical practitioner, he testified:

> I am less aggressive than neonatologists. I am as aggressive as those whom I consider to be very good pediatricians. I am much more aggressive than many pediatricians. And then, I qualify that by telling you that I've only known good pediatricians.
>
> I'm terribly proactive. Aggressive has a bad connotation. I'm terribly proactive in my practice of pediatric neurology. I would rather prevent seizures than treat seizures.

*Id.* at 114. In explaining the standard of care when dealing with an Rh baby, he stated that "from the moment of first visit to the obstetrician, the obstetrician's standard of care is one of hypervigilance and diligence." *Id.* at 201.

[8] He indicated that the obstetrician must consult a fellow physician in hematology to ensure coverage on the anti-Rh antibody and its course, that "you really have to recruit a fetal and maternal medicine person," and that "you're going to need sophisticated nursing care." *Id.* at 202. When asked to address the care provided by Dr. Johnston, Dr. Shuman testified in part that there was no evidence that a pediatric team was contacted or formed and that Kaitlyn was delivered into a hospital "where the blood bank was not prepared, where the

pediatric staff were not informed, a team had not been made, and the resources were not available to take care of her in crisis." *Id.* at 212. At a later point, during cross-examination, Dr. Shuman acknowledged that Dr. Johnston had recommended to Marigold that a high-risk specialist should be brought on board, and that she had refused, which Dr. Shuman characterized as "wrong-headed"; that Marigold should have accepted Dr. Johnston's advice; that Dr. Johnston's recommendation to involve a high-risk specialist was "the start of putting together a team"; and that a high-risk specialist could be a maternal fetal specialist or a neonatologist or both. Supplemental Transcript Volume II at 150.

[9] Concerning the nursing staff's performance following Kaitlyn's birth, Dr. Shuman stated in part:

> I certainly object to the nurses' lack of education[5] about the treatment of hyperbilirubinemia and the influence of breastfeeding on hyperbilirubinemia in the neonate and blaming mother for being a bad mother because she refused to breastfeed. That certainly falls below my standard of nursing care.

*Id*. at 146. He testified that the normal newborn nursing staff behaved

> as casually about this normal newborn delivery which is not of course a normal newborn delivery, but instead a high risk . . . a delivery of a high risk infant with hemolytic disease of the newborn. And off she goes to the nursery without any warning

---

[5] During cross-examination, Dr. Shuman testified that he had not met any of the Hendricks County nurses or been to Hendricks County Hospital.

signs posted – without any communication given to tighten observation.

In fact, she really should not have gone to the normal newborn nursery. She really should have gone to the special care nursery where the observation could be closer and perhaps where the pediatric nurses are more pediatrically oriented and more experienced.

Transcript Volume II at 212. When counsel for the Overshiners stated, "in your opinion, you know, we have here a child in the 21st century who is suffering – who was suffering from Rh disease, and now has been diagnosed with kernicterus, kernicteric CP" and asked "[s]hould this have happened," Dr. Shuman answered in the negative and testified that: "This is a disease which is preventable by diligent attention to the bilirubin levels"; that there is no acceptable reason for bilirubin to approach the probability of kernicterus and "[i]f it does, it's a violation of the standard of care, because the levels are available"; that "if it does, you've failed in preventing a preventable injury"; and "it's an event that shouldn't have happened. It's an error that shouldn't have happened. It's a violation of the standard of care." Transcript Volume III at 25-26.

[10] On December 5, 2017, the following exchange occurred between Dr. Shuman and counsel for Dr. Johnston:

[Counsel for Dr. Johnston]: As a pediatric neurologist, would you have treated [Marigold's] pregnancy with Kaitlyn?

[Dr. Shuman]: As a pediatric neurologist or as a – if I were an obstetrician or a neonatologist?

[Counsel for Dr. Johnston]: No. I'm saying, as in your specialty, would you be the right person to treat [Marigold's] pregnancy?

[Dr. Shuman]: Absolutely not.

Supplemental Transcript Volume II at 151.

[11] The Overshiners rested their case, and counsel for Hendricks Regional moved for a directed verdict with respect to the claims against it, arguing in part that Dr. Shuman did not articulate at any time that he was familiar with the standard of care "for the care and treatment of a board certified pediatrician," the standard of care "for a hospital; specifically, . . . relevant to a community hospital setting," or "the nursing standard of care required in 2004," which "would give this Court the ability to allow the jury to decide the issue of whether or not it can believe the things that Dr. Shuman has to say." Transcript Volume III at 73. He further argued that Dr. Shuman explained the standard of care "but . . . never told us that he's familiar with the standard of care. Importantly, the standard of care is not what Dr. Shuman thinks it is." *Id.* He explained that Dr. Shuman

> has been putting a different standard of care in this case. That being said, things such as, "I'm over-vigilant" or "hypervigilant," which he testified to – that this is his standard of care. Dr. Shuman doesn't get to sit around his pool in California, not practicing medicine, and get to tell this Court or your residents of Putnam County what the standard of care is.
>
> There is a standard in Indiana that requires him to come in here and demonstrate that he has an accurate understanding of what that standard of care is. That question was never asked by [counsel for the Overshiners]. It's a fundamental flaw . . . .

*Id.* at 74.  Dr. Johnston's counsel integrated Hendricks Regional's arguments into its own, and stated "I feel that it's well established in the State of Indiana that a testifying expert for the plaintiff must . . . set forth a familiarity with the standard of care" in the same or similar circumstance, and argued that:

> what's really instructive in this case is the failure to solicit from [Dr. Shuman] testimony that he was familiar with the standard of care.  And the reason why I'm convinced that the plaintiffs have known about this is because [Dr. Shuman's] affidavit that was used to defeat the summary judgment motions filed by the defendants after the 3-0 panel opinion . . . started with the first paragraph stating, I am familiar with the standard of care applicable to obstetricians and pediatricians. . . .
>
> [T]hat affidavit was never made evidence in this trial.  He had to give that testimony from the stand and he did not.

*Id.* at 77-79.  After additional discussion, counsel for the Overshiners requested an opportunity to prepare a brief on the law, which the court granted.

[12]  On December 6, 2017, the court indicated that the standard of care in Indiana "was never described" by Dr. Shuman, who "said what he would have done." *Id.* at 93.  After some discussion, the court dismissed the jury.  On December 13, 2017, the court issued an order which granted Providers' motion, directed a verdict in favor of Providers, and stated in part:

> [The parties' cited] cases stand for the proposition that an expert must know what the standard of care is, and at least in *McIntosh* [*v. Cummins*, 759 N.E.2d 1180 (Ind. Ct. App. 2011), *trans. denied*,] that she/he is familiar with that standard.

[Dr. Shuman] was critical of the OB/GYN care, the Pediatrician's care and the nurse[s'] care. However, at no time did he tell the jury what the applicable standard of care was. Court finds that Plaintiff [sic] cannot expect a jury to know what the applicable standard of care is. In a medical malpractice case, that is exactly why an expert is required – to tell the jury what the standard of care is and how the standard was breached. The jury cannot speculate what the standard is. The Court cannot instruct when evidence was not produced.

The Plaintiff [sic] cannot just tell the jury what her/his procedure/standards are – the standard must be, at least, told to the jury by the Plaintiff. And the only person able to do that in this trial was Dr. Shuman. As the Court foud [sic], he did not do so.

Appellants' Appendix Volume II at 49-50. The Overshiners filed a motion to correct error, which the court denied.

## *Discussion*

[13] The issue is whether the trial court erred or abused its discretion in granting a directed verdict in favor of Providers and denying the Overshiners' motion to correct error. The Overshiners contend that "[t]here is no requirement for a medical expert to testify he is familiar with the standard of care" and that, instead, if the expert does so testify, that statement provides a safe harbor against a challenge of unfamiliarity. Appellant's Brief at 22. The Overshiners further argue that Dr. Shuman testified multiple times to what the standard of care was, that it was violated, and that Kaitlyn was damaged as a result. They contend that he testified very specifically to what the proper treatment for a child in Kaitlyn's situation was, what the treatments actually given were, and what the

consequences of those treatments were; and that he thus illustrated on a practical basis what the standard of care meant when applied to Kaitlyn's situation.

[14] Hendricks Regional maintains that, in his four days of testimony, Dr. Shuman testified "regarding his personal preferences and how he believed that Katilyn should have received different treatment," which "does not equate to evidence that he was familiar with the standard of care, as to what the standard of care was, or that the standard of care was breached," and argues that he did not articulate what the standard of care actually required of it and its staff or how the standard of care was breached. Appellee Hendricks Regional's Brief at 19. Dr. Johnston contends in part that Dr. Shuman's training and experience in pediatric neurology and neuropathology did not qualify him to offer opinions in the specialty of obstetrics; that Dr. Shuman admitted he had no practice experience, training, or education in obstetrics; and that an expert must show a level of competence in a specialty that is not his or her own specialty to offer opinions in that specialty, *i.e.*, Dr. Shuman was to "provide the jury with testimony . . . that he had sufficient skill and experience in the specialty of obstetrics before he could support his criticisms" of Dr. Johnston's care. Appellee Dr. Johnston's Brief at 14.

[15] Ind. Trial Rule 50 provides that a motion for judgment on the evidence shall be granted "[w]here all or some of the issues in a case tried before a jury . . . are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it . . . ." Ind. Trial Rule 50(A). The purpose of a Trial Rule 50(A) motion for judgment

on the evidence is to test the sufficiency of the evidence presented by the non-movant. *Stewart v. Alunday*, 53 N.E.3d 562, 568 (Ind. Ct. App. 2016) (citing *Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 839 (Ind. 2012)). The grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Hill v. Rhinehart*, 45 N.E.3d 427, 435 (Ind. Ct. App. 2015) (citing *Levee v. Beeching*, 729 N.E.2d 215, 223 (Ind. Ct. App. 2000)), *trans. denied*. Upon appellate review of a trial court's ruling on such a motion, the reviewing court must consider only the evidence and reasonable inferences most favorable to the nonmoving party. *Belork v. Latimer*, 54 N.E.3d 388, 394-395 (Ind. Ct. App. 2016). A motion for judgment on the evidence should be granted "only when there is a complete failure of proof because there is no substantial evidence or reasonable inference supporting an essential element of the claim." *Stewart*, 53 N.E.3d at 568 (quoting *Raess v. Doescher*, 883 N.E.2d 790, 793 (Ind. 2008) (quotation omitted), *reh'g denied*). Likewise, judgment on the evidence is proper if the inference intended to be proven by the evidence cannot logically be drawn from the proffered evidence without undue speculation. *Hill*, 45 N.E.3d at 435 (citing *Levee*, 729 N.E.2d at 223. Also, we review rulings on motions to correct error for an abuse of discretion. *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008), *reh'g denied*.

[16] In general, "[t]o prevail in a medical malpractice action, the plaintiff must prove three elements: '(1) a duty on the part of the defendant in relation to the plaintiff; (2) failure to conform his conduct to the requisite standard of care

required by the relationship; and (3) an injury to the plaintiff resulting from that failure.'" *Whitfield v. Wren*, 14 N.E.3d 792, 797 (Ind. Ct. App. 2014) (quoting *Blaker v. Young*, 911 N.E.2d 648, 651 (Ind. Ct. App. 2009) (quoting *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind. 1992)), *reh'g denied, trans. denied*). "Physicians are not held to a duty of perfect care." *Syfu v. Quinn*, 826 N.E.2d 699, 703 (Ind. Ct. App. 2005) (citing *Slease v. Hughbanks*, 684 N.E.2d 496, 498 (Ind. Ct. App. 1997)). Rather, health care providers in malpractice cases must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class acting under the same or similar circumstances. *See Dughaish ex rel. Dughaish v. Cobb*, 729 N.E.2d 159, 164 (Ind. Ct. App. 2000) (citing *Vergara v. Doan*, 593 N.E.2d 185, 187 (Ind. 1992)), *trans. denied. See also Thomson v. Saint Joseph Reg'l Med. Ctr.*, 26 N.E.3d 89, 93 (Ind. Ct. App. 2015) (observing that "[h]ealth care providers must 'possess and exercise that degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful, and prudent practitioner in the same class to which [they] belong [ ] treating such maladies under the same or similar circumstances.'") (quoting *Vogler v. Dominguez*, 624 N.E.2d 56, 59 (Ind. Ct. App. 1993), *reh'g denied*, *trans. denied*).

[17] Unless satisfied by the rule of *res ipsa loquitur*, a medical malpractice plaintiff is ordinarily required to present expert opinion that a defendant health care provider's conduct fell below the applicable standard of care. *Chi Yun Ho v. Frye*, 880 N.E.2d 1192, 1201 (Ind. 2008) (citing *Perry*, 808 N.E.2d at 768). "This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care without the

benefit of expert opinion on the ultimate question of breach of duty." *Bader v. Johnson*, 732 N.E.2d 1212, 1217-1218 (Ind. 2000). "Medical negligence is thus not generally a conclusion that may be reached by a jury without such an expert opinion among the evidence presented." *Chi Yun Ho*, 880 N.E.2d at 1201. Such expert opinion takes on the character of an evidentiary fact in medical malpractice cases. *Id.*

[18]  In a medical malpractice claim, a medical review panel initially determines whether the defendant has met the applicable standard of care. *See Thomson*, 26 N.E.3d at 93 (citing Ind. Code § 34-18-8-4). Here it does not appear that the report of the medical review panel was admitted as evidence. *See* Ind. Code § 34-18-10-23 (providing that a "report of the expert opinion reached by the medical review panel is admissible as evidence in any action subsequently brought by the claimant in a court of law"). To the extent that the medical review panel report unanimously found that Providers did not breach the standard of care or cause the injuries being claimed, we find cases involving the summary judgment context instructive on this point and observe that in that context, this Court has found "[w]hen a medical review panel renders an opinion in favor of the physician, the plaintiff must come forward with expert medical testimony to rebut the panel's opinion," *Robertson v. Bond*, 779 N.E.2d 1245, 1249 (Ind. Ct. App. 2002), *trans. denied*, and that the Indiana Supreme Court has found that an affidavit which "states only that [the expert witness] would have treated [the plaintiff] differently, not that the [the defendant physician's]

treatment fell below the applicable standard" did not meet the burden to overcome summary judgment. *Oelling*, 593 N.E.2d at 190.

[19] As the Overshiners acknowledge in their brief, Dr. Shuman "never specifically stated 'I am familiar with the standard of care.'" Appellants' Brief at 7. To the extent the Overshiners argue that Dr. Shuman was qualified to testify to the standard of care and contend specifically that "the foundation for a medical expert to testify to the standard of care is that he must state his credentials and that he has reviewed the relevant medical records," Appellants' Brief at 25, they cite to an excerpt of this Court's decision in *Aldrich v. Coda*, a case concerning the standard of care for podiatrists at the summary judgment stage. 732 N.E.2d 243, 244-245 (Ind. Ct. App. 2000). We note that *Aldrich* involved an affidavit and letter of opinion by Dr. Shea, a "licensed, board certified orthopedic surgeon," and that, in holding that the affidavit was sufficient to establish a genuine issue of fact and preclude summary judgment, this Court stated:

> It would have been preferable if Dr. Shea had stated in his affidavit that he was familiar with the applicable standard of care for podiatrists. Be that as it may, it is evident from the content of the opinion letter that Dr. Shea, as an orthopedic surgeon, was indeed familiar with the standard of care required of [defendant physician,] Dr. Coda, as a podiatrist.

*Id.* at 245-246. We find *Aldrich* distinguishable and, instead, find instructive this Court's observation in *Lusk v. Swanson*:

> While it was reasonable in *Aldrich* to conclude that an orthopedic surgeon who diagnoses and corrects skeletal deformities may be

qualified to render an opinion on the standard of care of a podiatrist in such matters, it is not similarly reasonable to conclude that a pulmonologist is familiar with the standard of care required of an orthopedic surgeon.

753 N.E.2d 748, 754 (Ind. Ct. App 2001), *trans. denied*.

[20] Here, we find on the facts presented to the trial court that the Overshiners did not provide testimony that allowed the trier of fact to apply the appropriate standard of care. Dr. Shuman, a neuropathologist who had never been involved in the handover between the obstetrician and the pediatrician after a child is born and who at the time of trial was retired and provided mostly medical-legal consultations, did not testify to the standard of care required of Providers – *i.e.*, the standard of care applicable to obstetricians, pediatricians, and the nursing staff of a community hospital treating a child like Kaitlyn under the same or similar circumstances – but rather to his "terribly proactive . . . practice of pediatric neurology." Transcript Volume II at 114. He acknowledged that, with regard to his specialty, he would "[a]bsolutely not" be the right person to treat Marigold's pregnancy, and that he was not, nor eligible to be, a member of the American Academy of Pediatrics. Supplemental Transcript Volume II at 151. Our review of the record and Dr. Shuman's testimony makes clear that any inference intended to be proven by the evidence, as pointed to by the Overshiners, cannot logically be drawn without undue speculation as to the applicable standard of care. Thus, we conclude that the trial court did not err or abuse its discretion in granting a directed verdict in favor of Providers and denying the Overshiners' motion to correct error.

For the foregoing reasons, we affirm the entry of the directed verdict.

Affirmed.

Altice, J., and Tavitas, J., concur.