

FILED

Dec 18 2020, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John M. Mayer, Jr.
Clarksville, Indiana

ATTORNEYS FOR APPELLEE

Rodney L. Scott
John R. Hofmann
Waters, Tyler, Hofmann & Scott, LLC
New Albany, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Pamela Jane Scholl,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Mohammed E. Majd, M.D.,<br>*Appellee-Defendant* | December 18, 2020<br><br>Court of Appeals Case No.<br>20A-CT-571<br><br>Appeal from the Floyd Superior Court<br><br>The Honorable Susan L. Orth, Judge<br><br>Trial Court Cause No.<br>22D01-1708-CT-1221 |

**May, Judge.**

[1] Pamela Jane Scholl appeals following the trial court's grant of a motion for judgment on the evidence in favor of Dr. Mohammed E. Majd, M.D. Scholl argues she presented sufficient evidence regarding the applicable standard of care to defeat Dr. Majd's motion. We reverse and remand.

# Facts and Procedural History

[2] Scholl filed suit on August 26, 2017, alleging Dr. Majd, an orthopedic surgeon, committed medical malpractice when he performed lumbar fusion surgery and a subsequent revision procedure on her spine. The court began a jury trial on September 23, 2019. On the first day of trial, the parties selected a jury, the court read the preliminary instructions, and the parties gave their opening statements. Scholl testified on the second day of trial. Dr. Majd testified on the third day of trial, and then Scholl called Dr. Robert F. Sexton, M.D., to testify as an expert witness.

[3] Dr. Sexton received his Doctor of Medicine and Master of Surgery degrees in 1959 from the University of McGill in Montreal, Quebec. He then completed his residency at the University of Louisville and a fellowship at the Mayo Clinic in Rochester, Minnesota. He was drafted into the United States Army, and he served two years on active duty at Letterman General Hospital in San Francisco, California. The American Board of Neurological Surgeons deemed Dr. Sexton "board eligible," but he never became board-certified in neurosurgery.[1] (Tr. Vol. II at 12.) As a neurosurgeon, Dr. Sexton performed over 12,000 spine surgeries in his career, including over 10,000 laminectomies[2]

---

[1] Dr. Sexton testified that a "board eligible" designation indicates that he met all the qualifications to be board certified except for taking a three-hour oral examination.

[2] Dr. Sexton testified, "[l]amina is the posterior part of the bony ring that encircles the spinal cord, and a laminectomy is a removal of, either bilaterally or unilaterally, that lamina from around the vertebrae." (Tr. Vol. II at 21.)

and 150 fusions.[3] Dr. Sexton retired from performing surgery in 2005 or 2006, but he has maintained an active medical license and fulfilled his continuing medical education requirements in both neurosurgery and general medicine.

[4] Prior to testifying, Dr. Sexton reviewed Scholl's submission to the medical review panel and the depositions of the doctors on the medical review panel. Dr. Sexton testified:

> [Scholl's Counsel:] Based upon your experience as a neurosurgeon for 60 years, have you reached a conclusion about the care and treatment of Pam Scholl by Dr. Mohammed Majd?
>
> [Dr. Sexton:] I have, yes.
>
> [Scholl's Counsel:] And what is that conclusion, sir?
>
> [Dr. Sexton:] My conclusion is that I disagree with the review panel and their decision that Dr. Majd did not fall below the mythical standard of care of doing spine surgery.

---

[3] Dr. Sexton explained:

> A fusion is a fixation of at least two adjacent vertebra. In other words, you fasten them together. It can be done simply by putting in a bone graft from an individual patient or from a cadaver bone. And then from there, there are all sorts of external things that can be put in to reinforce the bone graft, screws, rods, bone marrow, either from the patients themselves or from bank bone marrow, and bone can be basically from any source. And the problem with the hardware putting in is that it is a foreign body. It's not a naturally occurring structure, and therefore the body tends to reject those if it can.

(Tr. Vol. II at 21.)

[Scholl's Counsel:] You used an interesting term. You say the "mythical standard of care" that—

[Dr. Sexton:] Yes.

[Scholl's Counsel:] You're saying that you found him below that standard of care. Is that correct?

[Dr. Sexton:] Yes.

[Scholl's Counsel:] In the treatment of Pam Scholl.

[Dr. Sexton:] Yes.

* * * * *

[Scholl's Counsel:] And you used the word "mythical." Explain that to the jury, please.

[Dr. Sexton:] There is no standard of care printed anywhere, you know, listed, but thou shall do so and so or thou shall not do so and so. As one of the review panelists stated in his deposition when asked to define standard of care, he said it's what a reasonably skilled doctor with reasonably skilled training would do in a given situation. That's apparently a low standard of care, and it really is not any specific thing you can put your finger on. So standard of care is each doctor decides it for himself or herself, and that's why I use that term. There really is not a code anywhere printed in the AMA literature, the textbooks, or anywhere that says this is the standard of care for such and such. So it's something that you have to figure out by the seat of your pants and say, is that okay.

> [Scholl's Counsel:] And you have concluded that the care and treatment of Pam Scholl by Dr. Majd is below the standard of care?
>
> [Dr. Sexton:] I did.

(*Id*. at 19-20.) Scholl asked Dr. Sexton, "is there anything that stuck out in the records to you that was significant that helped you reach your conclusion that Dr. Majd's treatment of Pam Scholl is below the standard care?" (*Id*. at 28-29.) In his answer, Dr. Sexton noted the "sparse workup" in Scholl's medical records prior to Dr. Majd performing the surgery, and he described performing fusion surgery to correct Scholl's condition as "very controversial." (*Id*. at 29.) Dr. Sexton also explained a "prudent spine surgeon" would have performed a bone density test before the surgery because Scholl was taking Vitamin D2. (*Id*. at 30.)

[5] Scholl went on to ask, "was the choice that Dr. Majd used doing the fusion the way he did that with the screws, was that in your opinion below the standard of care," and Dr. Sexton answered, "Based on the outcome, yes, I think it was. And, in fact, that's my opinion." (*Id*. at 33.) Dr. Sexton explained that when Dr. Majd performed the fusion surgery, he placed a screw too close to Scholl's iliac artery, resulting in nerve damage to Scholl. Dr. Sexton testified that he believed the standard of care in operating on Scholl required the spine surgeon to perform "[o]ne of two things, either a decompressive laminectomy or a bone graft without the hardware." (*Id*. at 34.)

On cross-examination, Dr. Sexton testified:

> [Dr. Majd's Counsel:] Doctor, I'd also like to talk to you before we talk about the things we're going to disagree on, like to talk to you about the things that we do agree on following your deposition. Specifically, we agreed that no surgery is 100 percent successful, correct?

> [Dr. Sexton:] Yes, we do.

> [Dr. Majd's Counsel:] We also agreed the doctor doesn't have to be perfect in performing the surgery, right?

> [Dr. Sexton:] No.

> [Dr. Majd's Counsel:] In other words, the doctor can make a mistake. It's still not violating the standard of care.

> [Dr. Sexton:] There is no such thing as a standard of care except what the individual doctor thinks it is.

> [Dr. Majd's Counsel:] We'll come back to that. That's one of the things we're going to disagree on in a minute. Additionally—

> [Dr. Sexton:] Good luck with that.

> [Dr. Majd's Counsel:] -negative results, bad outcomes, whatever you want to call it, happen following surgeries, right?

> [Dr. Sexton:] Occasionally, and not in flurries and—

> [Dr. Majd's Counsel:] You said in your deposition that 40 to 50 percent of fusions have a bad outcome.

[Dr. Sexton:]  Yeah.

[Dr. Majd's Counsel:]  Correct?  In your opinion, you think it's 40 to 50 percent?

[Dr. Sexton:]  Yes, to some degree.

[Dr. Majd's Counsel:]  And that doesn't mean in any way that the doctor happened to violate standard of care, right?

[Dr. Sexton:]  Whatever that is, no.

[Dr. Majd's counsel:]  Okay.

[Dr. Sexton:]  I agree.

[Dr. Majd's counsel:]  And that – those bad outcomes happen without malpractice on the part of the doctors.

[Dr. Sexton:]  To a degree they can, yes.

[Dr. Majd's counsel:]  And additionally –

[Dr. Sexton:]  Just because though, they do happen, and because they're recognized as occurring occasionally does not let the doctor off the hook on 100 percent of cases by any means.

[Dr. Majd's counsel:]  Okay.  And I'm not suggesting –

[Dr. Sexton:]  Well, I think you are, but go ahead.

[Dr. Majd's counsel:] My question to you is, ultimately, a bad outcome does not mean bad medicine.

[Dr. Sexton:] Not per se.

(*Id.* at 67-68.)

[7] After Scholl rested her case, Dr. Majd moved for judgment on the evidence on the basis that Dr. Sexton did not demonstrate a familiarity with the applicable standard of care, and the court granted Dr. Majd's motion. Scholl subsequently filed a motion to correct error on October 28, 2019, arguing the trial court erred in granting Dr. Majd's motion for judgment on the evidence. The trial court held a hearing on Scholl's motion on February 3, 2020, and then summarily denied the motion on February 11, 2020.

# Discussion and Decision

[8] Scholl argues the trial court erred in granting Dr. Majd's motion for judgment on the evidence because Dr. Sexton's testimony adequately conveyed to the jury the applicable standard of care and Dr. Sexton's opinion why Dr. Majd did not perform up to the standard of care. Indiana Trial Rule 50(A) states:

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

"A motion for a directed verdict, also known as a motion for judgment on the evidence, challenges the legal sufficiency of the evidence." *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 106 (Ind. Ct. App. 2014), *aff'd on reh'g*, 25 N.E.3d 748 (Ind. Ct. App. 2015), *trans. denied*. We apply the same standard as the trial court when reviewing the grant or denial of a motion for judgment on the evidence. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007).

[9] In our review of a trial court's decision on a motion for judgment on the evidence, we review all evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Id*. "[T]he motion should be granted only where there is no substantial evidence to support an essential issue in the case. If there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper." *Id*. (internal citation omitted); *see also Dahlin v. Amoco Oil Corp.*, 567 N.E.2d 806, 810 (Ind. Ct. App. 1991) (judgment on the evidence is appropriate when there is a "complete failure of proof . . . supporting an essential element of the claim"), *trans. denied*.

[10] To prevail on a medical malpractice claim, the plaintiff must prove: "(1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries." *Green v. Robertson*, 56 N.E.3d 682, 692 (Ind. Ct. App. 2016), *reh'g denied*, *trans. denied*. Generally, before a medical malpractice claim may proceed in trial court, the proposed complaint must be presented to a medical review panel and the panel must give its opinion. Ind. Code § 34-18-8-4. When the medical review panel renders an

opinion adverse to the plaintiff, the plaintiff must present expert testimony at trial to establish: "1) the applicable standard of care required by Indiana law; 2) how the defendant doctor breached that standard of care; and 3) that the defendant doctor's negligence in doing so was the proximate cause of the injuries complained of." *Allen v. Hinchman*, 20 N.E.3d 863, 870 (Ind. Ct. App. 2014), *reh'g denied*, *trans. denied*. To meet the standard of care, "'a physician must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which he belongs, acting under the same or similar circumstances.'" *Id*. (quoting *Vergara by Vergara v. Doan*, 593 N.E.2d 185, 187 (Ind. 1992)).

[11] In granting Dr. Majd's motion for judgment on the evidence, the trial court analogized Dr. Sexton to the expert in *Overshiner v. Hendricks Regional Health*, 119 N.E.3d 1124 (Ind. Ct. App. 2019), *reh'g denied*, *trans. denied*, and explained:

> In our case, Dr. Sexton did not articulate at any time [that] he's familiar with the standard of care for the treatment and care of a board-certified orthopedic surgeon, never told us that he's familiar with the standard of care, that further there is a standard of care that requires him to come into court and demonstrate that he has an accurate understanding of what that standard of care is. He did not do that.

(Tr. Vol. II at 96.) Scholl argues the case of *Aldrich v. Coda*, 732 N.E.2d 243 (Ind. Ct. App. 2000), is a more appropriate comparison to the case at bar than *Overshiner*.

[12]    In *Overshiner*, the plaintiffs' newborn daughter developed an illness that resulted in blindness, and the plaintiffs filed malpractice claims against the obstetrician, the pediatrician, and the hospital. 119 N.E.3d at 1126. At trial, the plaintiffs called, as a medical expert, Dr. Robert Shuman, a retired neuropathologist who studied autopsied brains of children. *Id*. Dr. Shuman testified the newborn's disease was preventable and he faulted the obstetrician and the hospital for not properly taking care of the newborn. *Id*. at 1128-29. However, Dr. Shuman also testified that he was neither an obstetrician nor a pediatrician and that he would "[a]bsolutely not" be the right doctor to care for a pregnant patient. *Id.* at 1129. After the plaintiffs rested their case, the defendants moved for judgment on the evidence, and the trial court granted the defendants' motion on the basis that the plaintiffs' medical expert, Dr. Shuman, did not articulate familiarity with the applicable standard of care, which would leave the jurors to speculate regarding the appropriate standard of care. *Id*. We affirmed and held

> the [plaintiffs] did not provide testimony that allowed the trier of fact to apply the appropriate standard of care. Dr. Shuman, a neuropathologist who had never been involved in the handover between the obstetrician and the pediatrician after a child is born and who at the time of trial was retired and provided mostly medical-legal consultations, did not testify to the standard of care required of Providers - *i.e.*, the standard of care applicable to obstetricians, pediatricians, and the nursing staff of a community hospital treating a child like [the newborn] under the same or similar circumstances—but rather to his "terribly proactive . . . practice of pediatric neurology."

* * * * *

> Our review of the record and Dr. Shuman's testimony makes clear that any inference intended to be proven by the evidence, as pointed to by the [plaintiffs], cannot logically be drawn without undue speculation as to the applicable standard of care.

*Id.* at 1133.

[13] Conversely, in *Aldrich*, the plaintiff brought a medical malpractice action against her podiatrist. 732 N.E.2d at 244. The trial court granted summary judgment in favor of the podiatrist on the basis that the affidavit from the plaintiff's designated medical expert did not state the medical expert was familiar with the standard of care for podiatrists. *Id*. We reversed the trial court's entry of summary judgment. *Id*. at 246. Even though the medical expert's affidavit did not specifically state that he was familiar with the applicable standard of care for podiatrists, we held that "it is evident from the content of the opinion letter that [the medical expert], as an orthopedic surgeon, was indeed familiar with the standard of care required of [the defendant], as a podiatrist." *Id*.

[14] Dr. Majd argues that Dr. Sexton, like the expert in *Overshiner*, misstated the standard of care and left the jury to speculate as to the applicable standard of care. We disagree. Dr. Sexton quoted a doctor from the medical review panel's deposition testimony that the standard of care is "what a reasonably skilled doctor with reasonably skilled training would do in a given situation." (Tr. Vol. II at 20.) While this was not a word-for-word recitation of the legal definition for standard of care, it demonstrates Dr. Sexton was at least

somewhat familiar with the legal bar for what constitutes medical malpractice. Moreover, unlike the expert in *Overshiner* but like the expert in *Aldrich*, Dr. Sexton was familiar with treating patients suffering from the same condition as the plaintiff, and Dr. Sexton had performed the same type of surgery Dr. Majd performed on Scholl and other similar spine surgeries. Thus, he could speak to what a reasonably skilled, careful, and prudent doctor would do and not do in treating a patient like Scholl. For example, he testified that a "prudent spine surgeon" would have performed a bone density test before the surgery. (*Id.* at 30.)

[15] Dr. Sexton also opined that the applicable standard of care required Dr. Majd to treat Scholl's condition by performing a laminectomy rather than a fusion with hardware and that Scholl suffered nerve damage because Dr. Majd placed a screw too close to her iliac artery. While Dr. Sexton did describe the standard of care as "mythical" and something "each doctor decides . . . for himself or herself," he clarified in his testimony that he was referring to the fact that the standard of care is not clearly defined in an authoritative source. (*Id.* at 20.) The standard of care is not "mythical," but it leaves room for interpretation as we expect experts in a medical malpractice action to disagree about what the applicable standard of care requires in any given situation. Dr. Sexton's comments were imprecise, but they do not show a lack of familiarity with the applicable standard of care. Therefore, we hold the trial court erred in granting Dr. Majd's motion for a directed verdict, and we remand the case for further proceedings consistent with this opinion. *See Killebrew v. Johnson*, 404 N.E.2d

1194, 1197 (Ind. Ct. App. 1980) (holding plaintiff's medical expert adequately stated the applicable standard of care and reversing the trial court's directed verdict for defendant).

# Conclusion

[16] Scholl presented sufficient evidence regarding the applicable standard of care to defeat Dr. Majd's motion for judgment on the evidence. Dr. Sexton demonstrated familiarity with the procedures Dr. Majd performed on Scholl and identified several aspects of Dr. Majd's treatment of Scholl that Dr. Sexton believed fell below the standard of care. Therefore, we reverse the trial court's entry of judgment on the evidence in favor of Dr. Majd, and we remand the case for further proceedings not inconsistent with this opinion.

[17] Reversed and remanded.

Riley, J., and Altice, J., concur.